**NORRIS et al. v. COX et al.**

No. 3795.

Court of Civil Appeals of Texas. El Paso.

Jan. 26, 1939.

Rehearings Granted March 23, 1939,
July 6, 1939.

Rehearing Denied Sept. 11, 1939.

On rehearing Eugene T. Edwards and Tom Lea, both of El Paso, J. W. Ragsdale, of Victoria, G. A. Tunstill, of Houston, and ·Clay Cooke, of Fort Worth, for appellants.

Harvey T. Fleming, of Houston, for cross-appellant.

Sam Neathery, W. J. Howard, Fouts, Amerman & Moore, Archie D. Gray, Fulbright, Crooker & Freeman, Nowlin Randolph, Eldon Young, and John E. Green, Jr., all of Houston, Rice & Rice, of San Antonio, Watkins & Mays, Ross Lea, Dallas C. Biggers, and T. L. Wynne, all of Dallas, F. H. Crain, Crain, Vandenberge & Stofer, E. L. Dunlap, Linebaugh & Guittard, and Fred C. Proctor, Jr., all of Victoria, David Proctor, of Fort Worth, and Harold M. Hankamer, of El Paso, for appellees.

WALTHALL, Justice.

This suit was brought by Dr. F. A. Norris and others, appellants here, against appellees, Gulf Production Company and others, to recover certain undivided interests in six oil and gas mineral leasehold estates in Victoria County, Texas. The suit is brought in trespass to try title; the several leasehold estates are fully described in the petition, stating the acreage in each. Appellants also seek to recover of appellees a proportionate part of the oils and gas alleged to have been produced and converted by appellees from the leaseholds in the years 1934 and 1935.

We will not undertake to discuss the various propositions presented in appellants' brief, but will state and undertake to review the matters of contract which are necessarily the basis of the matters in controversy in the suit between the parties.

The record shows that during the years 1928 and 1929, appellee, Gulf Production Company, secured a block of 4,075 acres of land in Victoria County, Texas, on which the mineral leaseholds involved in this suit are located. The Company paid a valuable consideration for the 4,075 acres and thereby owned the leasehold interests involved here and of which the Company thereafter, on September 30, 1932, by an assignment, conveyed twenty-one mineral leases, including the leases in question, to William A. Stone. We copy here the contract of conveyance, with the exception of the description of the twenty-one mineral leases, appellants' Exhibit No. 17:

"The State of Texas,
"County of Victoria.

"Subject to the terms and conditions hereinafter set out, Gulf Production Company hereby transfers and assigns to William A. Stone the oil and gas rights now owned by it under the terms of the following mineral leases covering lands in Victoria County, Texas:

* * * * * *

to all of which leases and the record thereof reference is here made for all purposes.

"1. Stone binds and obligates himself to begin operations for the drilling of a well upon said block within 90 days from date and to prosecute the drilling of said well with reasonable diligence to a depth of 5100 feet unless oil or gas in paying quantities is produced at a lesser depth. Should said well be abandoned as a dry hole, then Stone shall within fifteen (15) days from date of abandonment of said well notify Gulf Production Company that he will, within 45 days from date of abandonment of said well, either begin operations for the drilling of a second well upon said land and continue his operations on said second well to the same depth as above set out, or will upon demand retransfer and reassign all rights hereby transferred, to the Gulf Production Company. If as a result of operations conducted under the terms hereof oil or gas is produced in paying quantities, then and thereafter Stone shall conduct such operations on the land described in said leases as may be necessary to develop said leases in a reasonable manner.

"II. All costs and expenses incurred by Stone in his operations on said land shall be paid by him. If as a result of his operations on said land oil or gas shall be produced in paying quantities, then, after paying all costs and expenses incurred in drilling, equipping, and operating said leases, Stone shall account to the Gulf Production Company for one-fourth of the net profits of said operations. The costs and expenses referred to herein are defined as follows:

"(a) All drilling costs and expenses as well as the cost, repair, upkeep, and maintenance of all material, equipment, and property of every kind devoted exclusively to the development of and used upon this property (except purchase of drilling rigs), including employers' liability and derrick insurance.

"(b) The cost of all labor, whether clerical, common labor or executive services devoted exclusively to and performed upon the property.

"(c) The cost of properly disposing of salt water.

"(d) A charge for overhead equal to five percent of the amount of money spent

every month by Stone under subdivision (b), said charge not to exceed Five Hundred Dollars ($500.00) per month.

"(e) All State, County and District taxes, the gross production tax, and other taxes, if'any.

"(f) All royalties and all other charges against the net proceeds from the production from said land.

"III. Accountïng hereunder' shall be made at the end of each calendar month. Losses and arrears may be brought forward from month to month. Within one month after the close of each calendar month Stone shall .furnish Gulf a statement showing all costs and expenses incurred and all credits and receipts during such calendar month, and if such statement shall show a profit, then payment of ¼ of such profit shall promptly be made to Gulf. Any objections and exceptions to the statement as rendered shall be made by Gulf within 60 days from receipt of same, and if no exception is made within such time, then such statement shall be considered as correct. If, within said 60 day period, it should develop that such statement should have included charges which through error were not incorporated therein and if such charges are agreed to by Gulf, then Gulf shall reimburse Stone to the extent of ¼ of said charges, provided that such reimbursement by Gulf shall never exceed the amount which it received at the time such statement was rendered. If, within said 60 days period, it should develop that incorrect charges have been made by Stone, then full adjustment shall be promptly made by Stone, and all money due Gulf by reason of such adjustment shall be promptly paid to it.

"IV. It is expressly understood that only the oil and gas rights given and created by said leases are transferred hereby, and that Gulf Production Company hereby specifically reserves all sulphur rights given and created by the terms of said leases, together with the superior right at any and all times to enter upon said land and conduct such operations as it may desire for the production of sulphur therefrom.

"V. Stone may, if he elects, transfer and assign all of the interests, rights and privileges acquired by him under this assignment and contract to a corporation organized by him for the purpose of developing the leases hereinbefore described and of taking over operations to be conducted upon said leases as contemplated by the terms hereof, otherwise no sale, transfer, or assignment shall be made of said leases as a whole or in entirety prior to the discovery of oil, gas or other minerals in paying quantities on land covered by one or more of the above described leases, except under the circumstances hereinafter provided; however, sales may be made by said Stone or said corporation of undivided interests in said leases throughout the entirety thereof or throughout the entirety of all the right, title, and interest hereby assigned unto said Stone, but not otherwise. The several owners of such undivided interests, their successors and assigns, may sell and assign their respective undivided interests in said leases, but the same limitations imposed upon Stone and/or said corporation with reference to the sale of said leases, as a whole or in entirety, shall likewise apply to the owners in the aggregate of undivided interests in said leases.

"Should Stone and/or said corporation and/or the owners in the aggregate of undivided interests in said leases, desire to sell said leases as a whole or in entirety, after discovery of oil, gas or other minerals in paying quantities on land covered by one or more of the above described leases, then the owners of said leases as to all and the whole and entire right, title, and interest therein which is hereby conveyed, or the duly authorized legal representatives of such owners, shall notify Gulf in writing at least three (3) days in advance of accepting any bona fide offer that may be made therefor, and Gulf shall have the right within said time to purchase said leases at the best price offered therefor. No offer shall be considered from other than one able and capable of complying with such offer. Should Gulf, after being so notified, decide not to so purchase said property, the foregoing limitations imposed upon said Stone and upon said corporation and owners of undivided interests in said leases shall be of no further effect.

"The purchaser at any sale made by said Stone or said corporation and owners of undivided interests in said leases shall succeed to all the rights and privileges granted to Stone hereunder.

"VI. Gulf Production Company shall have the right to purchase the oil produced from said land by paying therefor the average posted price for oil of like grade or gravity in the Gulf Coast Area at the time of production. The right to purchase shall be exercised in writing within ten days after Stone notifies Gulf Production

Company that production in paying quantities has been secured and when exercised shall cover the next succeeding six calendar months; thereafter, Gulf Production Company shall continue to purchase said oil for like six months periods until it gives Stone at least thirty days notice before the end of any such period of its intention to cease doing so. Stone shall thereupon make such sale of said oil as he may desire, but no sale shall be made by him for less than the average posted price in the Gulf Coast Area at the time of production. No contract shall be made by him for the sale of said oil for a longer period than one year. Sixty days before the expiration of any contract that he may make for the sale of said oil, Stone shall notify Gulf Production Company, and unless it shall notify Stone within thirty days of its desire to purchase said oil as above provided, then Stone shall have the right to contract for the sale of said oil as above set out. This plan shall be pursued so long as said leases are owned by Stone. Should Stone sell his interest in said leases to a third party (after Gulf Production Company refuses to purchase as provided in the preceding paragraph), such purchaser shall be obligated to make known in writing to Gulf Production Company at the time of sale of its intention to accept and run the oil produced from said leases from the time of purchase, and failing to give such written notice, Gulf Production Company shall thereafter have the right to purchase and run the oil produced from said leases, as provided above.

"VII. Should Stone secure the extention or renewal of any or all of said leases, then all the terms and conditions of this agreement shall thereafter apply to such leases as may be extended or renewed.

"VIII. Stone binds and obligates himself to comply strictly with all the terms and conditions of said lease. In the event he is unable so to do, he obligates himself to notify Gulf Production Company thirty (30) days before the maturity of any obligation of any of said leases of his inability to comply with such obligation and agrees that he will, upon demand, retransfer and reassign to Gulf Production Company, free of all encumbrances, all rights herein transferred and assigned in so far as they relate to the particular lease or leases the obligations of which he is unable to fulfill, and thereafter such lease or leases shall

be held by Gulf Production Company free and clear of the terms of this agreement.

"IX. This transfer and assignment is made without warranty, express or implied.

"To have and to hold unto the said William A. Stone, his heirs and assigns.

"Executed in duplicate this the 30th day of September, 1932.

"Wm. A. Stone
"[Seal]     Gulf Production Company,
     "By L. P. Garrett, Vice President."

The contract of conveyance was duly acknowledged and recorded and offered in evidence by appellants for all purposes.

Subsequent to the assignment to Stone, Stone proceeded to organize a corporation, Stonleigh Oil & Gas Company, for the purpose of developing these leases. Thereafter, Stonleigh Oil & Gas Company sold to various parties, including appellants, certain units of undivided interests in these leases, their several interests evidenced by certificates. The certificates issued by Stonleigh Oil & Gas Company to appellants evidencing their interests are the claims which appellants plead in this suit.

Among other things, each of these certificates provides:

"The State of Texas
"County of ———.

"Whereas, on, to-wit, the 30th day of September, A. D. 1932, Gulf Production Company made, executed and delivered unto William A. Stone, an assignment to twenty-one certain oil, gas and mineral leases, covering approximately four thousand and seventy-eight (4078) acres of land, situated in ——— in Victoria County, Texas, said assignment being duly recorded in Volume ———, Page ———, of the Deed Records of Victoria County, Texas; which said assignment and the record thereof is here referred to and made a part hereof for all the terms and conditions thereof, for dates and names of lessors and lessee, of and in said respective leases and volume and page numbers of the deed records of said County where said respective leases are recorded, said leases and the record thereof being also here referred to and made a part hereof for all the terms and conditions thereof and for particular description of the property thereby and which said assignment applies to renewals and extensions of said leases secured by William A. Stone and provides for certain drilling operations and provides,

among other things, that Gulf Production Company shall receive one-fourth (¼th) of the net profits derived from operations under and the performance of said contract and which said leases and extensions and renewals thereof, in addition to royalties payable to lessors thereunder, are subject to an outstanding one forty-eighth (¹⁄₄₈) overriding royalty on oil produced therefrom and thereunder; and

"Whereas, the said William A. Stone has transferred and assigned said leases into Stonleigh Oil & Gas Company, a corporation, for the purpose of carrying out and performing the agreements contained in said assignment from Gulf Production Company to said Stone and for all other purposes; and

"Whereas, it is the desire of Stonleigh Oil & Gas Company, the present owner of said leases, subject to the rights and powers herein reserved, to transfer and assign unto the Assignee hereinafter named, the fractional interest in said leases hereinafter specified:

"Now, therefore, know all men by these presents: That Stonleigh Oil & Gas Company, hereinafter called Assignor (the term 'Assignor' shall be deemed to include such substitutes as said Stonleigh Oil & Gas Company may appoint to act for it hereunder) for and in consideration of the sum of ——— ($———) Dollars cash to it in hand paid by the hereinafter named Assignee (the term 'Assignee' shall be deemed to include Assignee and all subsequent owners of the interest here assigned) the receipt of which is hereby acknowledged and confessed, and for the further consideration and upon and subject to the terms, conditions and reservations herein contained (and subject to the terms and provisions of said leases and assignments thereof through and under which Assignor holds title thereto) do hereby bargain, sell, transfer and assign unto, etc."

Stonleigh Oil & Gas Company proceeded to drill two of these leases. The first well drilled was dry. A second well was commenced and was abandoned at about 4,800 feet because of a blow-out. Apparently in neither well was oil or gas produced in paying quantities.

Following Stonleigh Oil & Gas Company's unsuccessful attempt to drill these leases in accordance with the terms and provisions of the Gulf-Stone contracts, Stonleigh Oil & Gas Company became involved in financial difficulties and was unable financially to proceed further in the development of the leases. Several of the leases were about to expire by their own terms, and would be lost. Stonleigh Oil & Gas Company had not complied with the Gulf-Stone contract and was then unable financially to do so. None of appellants offered to do so or was able to do so. In the above financial situation, on March 8, 1934, Stonleigh Oil & Gas Company, authorized by its Board of Directors, conveyed to appellee Rupert Cox eighteen of the original twenty-one leases, (the others having previously expired) for the following consideration: "for and in consideration of Ten Dollars ($10.00) cash to each of us in hand paid by Rupert Cox, of Houston, Texas, hereinafter called Grantee, receipt of which is hereby severally acknowledged, and the further sum of Four Hundred Eighty-six Thousand, Two Hundred and Eighty Dollars ($486,-280.00) to be paid by grantee herein or his assigns to Sellers (as their interests appear) out of one-eighth (⅛) of sixty-seven per cent (67%) of forty-one-forty-eighths (41/48ths) of the oil and/or gas, if, as and when produced and saved from the hereinafter described properties, (save and except that on and from certain properties described below there shall be no oil payments)."

Thereafter, Gulf Production Company conveyed to Rupert Cox certain of these leases, and Rupert Cox conveyed to Gulf Production Company certain of said leases. Following the above transactions Gulf then conveyed those it had acquired in the conveyance from Cox in consideration of certain oil payments.

Of the leases originally obtained by Gulf from Cox, all had expired by their own terms with the exception of three, on which it retained oil payments. The present interest of the Gulf Production Company in the entire block at the time of the suit is an oil payment on three of the leases.

Subsequent to the assignment of the Stonleigh Oil & Gas Company as above, to Cox, and the transfer from Cox, oil and gas were found and were being produced at the time of the trial from portions of six of these leases. Of the leases obtained by Gulf Production Company from Cox and subsequently assigned by it to others, retaining oil payments thereon, portions of three of these leases have proved productive, namely, a portion of the Etta Terrell (being that portion assigned

by Gulf to Stone by the contract of date September 30, 1932), a portion of the Pribyl, and a portion of the Gaugler. Appellants also own oil payments on two of these leases, the Pribyl and Gaugler.

So far as we can discover the interests appellants have in the leases must be found in and stem from the assignments the Gulf Production Company had with Stone, or Stonleigh Oil & Gas Company. After the incorporation of the Stonleigh Company, we have nothing in the record to indicate that the Gulf Production Company had anything to do with the direction or supervision of that Company nor with the sale of the units to appellants. It received none of the proceeds from the sales, did not solicit appellants or have knowledge that units were being sold to appellants; has never drilled any of the leases or run oil from any of them or purchased any of the oil so run.

As to appellees other than the Gulf Production Company, and including that Company, the record shows, we think, the appellants do not hold interests under deeds, but under instruments of an entirely different character. Appellants were never in possession of the leases nor entitled to possession. Nor were they in possession of the leaseholds or any portion of any of them, and were never ousted by any of appellees. It seems to us that every right appellants are entitled to under their pleadings was given to them by the trial court in the judgment, as follows:

"It is further considered by the court, and so ordered, adjudged and decreed, that this judgment is rendered and entered herein without prejudice to the oil and gas payment of the plaintiffs, and others similarily situated herein, including the intervener herein, B. H. Jenkins, the defendant and cross plaintiff, Stoneleigh Oil and Gas Company, and the defendants C. W. Boyer, J. A. Muhl, T. A. Muhl and T. T. Word, as fixed by that certain assignment executed by Stoneleigh Oil and Gas Company et al., as assignors, to Rupert Cox, as assignee, dated March 8th, 1934, and recorded in Volume 142, page 294, of the Deed Records of Victoria County, Texas, and by the ratification and amendment of said assignment dated April 11, 1934, and recorded in Volume 141, page 633, of the Deed Records of Victoria County, Texas, and it is further ordered, adjudged and decreed by the court that said oil and gas payment as fixed in said instruments shall be in no manner affected, disturbed or changed by this judgment, but said oil and gas payment shall remain in full force and effect as fixed and determined by and in said instruments; except as to the John Zimmer one hundred and twenty-five (125) acre tract the oil payment as to which tract shall be only one-half of that fixed by the contract and assignment of March 8, 1934, as provided and set out in that certain agreement between Stoneleigh Oil and Gas Company and Rupert Cox on the 5th day of October, 1934, recorded in Volume 146, at page 322, of the Deed Records of Victoria County, Texas."

What we have said as to other appellants likewise applies to the contentions of appellant Stonleigh Oil and Gas Company.

We have concluded that the trial court was not without power and jurisdiction to extend the special term of the court at which the suit was first tried until all matters connected therewith were disposed of. The order of extension was sufficiently definite. Brooks v. Morgan, Tex.Civ.App., 121 S.W.2d 398, writ refused.

The propositions submitted by appellants are too numerous to be severally discussed in an opinion. We have, however, considered each and have found no reversible error, and they are each overruled.

The case is affirmed.

### On Rehearing.

NEALON, Chief Justice.

At a former day of this term, upon motion of appellants, we entered an order reversing judgment in this case and remanding it to the lower Court. The order was based upon the belief that the evidence of Fred G. Reed and J. H. Dwire denying that the deed as originally executed contained exemptions from oil payments, and the further evidence of Cleo Sheiler that the physical condition of the deed of March 8, 1934, indicated changes in the arrangement of the pages and perhaps substitution of pages. A number of motions for rehearing have been filed, the case has been argued, and we have reexamined the grounds upon which we acted. In our former opinion we overlooked the fact that not all the defendants in whose favor the verdict was instructed possessed interests identical in their origin with all the other defendants, and that some of

them did not depend upon the deed or assignment dated March 8, 1934, which is under attack.

At the risk of tedious repetition, we shall amplify the statement of the case heretofore made. The original opinion gave an accurate general picture of the case. As stated therein, all rights of appellants are subject to and stem from the assignment of the Gulf Production Company to William A. Stone dated September 30, 1932. By the terms of that instrument the Gulf Production Company, subject to the terms thereof, assigned to William A. Stone the oil and gas rights owned by it under twenty-one mineral leases, except that as to what was described as the Etta Terrell lease (of which more will be said hereinafter) what was known as the Second Tract thereof was not included in the assignment, and it expressly related only to the First and Third Tracts of said lease.

As heretofore stated, the Gulf Production Company retained for itself 25 percent of the net value of the production from the leases assigned. The assignment provided that Stone might organize a corporation to exercise the rights resulting from the assignment. He organized the Stonleigh Oil and Gas Company, and the interests assigned by the Gulf Production Company constituted the entire capital of said last named corporation. It was therefore essential that the development work necessary to hold the leases be financed through the disposal of interests arising by virtue of the assignment, since the corporation had no cash capital of its own.

Among other methods resorted to, the Stonleigh Oil and Gas Company assigned to Dr. F. A. Norris and others certain interests in the leases. The contract of assignment is too lengthy to be reproduced, but as we have construed it, it effected an assignment of undivided interests in the net profits, if any, resulting from the operation of the properties. The rights created by these assignments were subject to the rights of the Gulf Production Company as was stated in the assignment executed by it. Possession of the properties and the right and duty of operating them were to remain in the Stonleigh Oil and Gas Company, though it might name a substitute, and it was the duty of this Company to account annually to the assignees of the class of appellants in this case for their proportionate share of the earnings

of the venture. These assignees were not entitled to possession of the real property and they never went into possession. Their rights were confined to a percentage of net profits. The Company was not liable for mistakes of judgment. It was required only to exercise good faith and refrain from fraudulent conduct towards its assignees.

Stonleigh Oil and Gas Company drilled two wells, but up to March 8, 1934, had failed to produce oil or gas in paying quantities. Appellants object to our finding of fact to this effect. However, we think it is justified by the evidence and by appellants' pleading. In their fifth amended original petition, upon which they went to trial, while relating the occurrences preceding the execution of the conveyance from Stonleigh Oil and Gas Company to Rupert Cox which is the subject of attack, they allege "that thereafter and before the discovery of oil and/or gas in paying quantities * * * the Stonleigh Oil and Gas Company, acting through said Stone, but not by plaintiffs, entered into a contract with Rupert Cox on or about February 28th, 1934."

During the month of February, 1934, the situation, from the point of view of Stone (who was the beneficial owner of practically all, if not all, of the stock of the Stonleigh Oil and Gas Company) and that of the corporation itself, was very precarious. There was no production. The time was approaching when the leases might be subject to forfeiture, and the implied obligation to develop which all owed to the original lessors could only be discharged by assistance from some other source. It is not made to appear by the evidence that appellants, or any of them, were able to finance future drilling, or willing to do so. Their individual investments were small and it would be reasonable to suppose that they would not desire to hazard large sums of money upon the development of an unproven area.

An interest of 12½ percent had been assigned to B. H. Jenkins to secure the payment of a debt for $10,000 owed him by the Corporation. W. J. Howard held a five percent interest which did not contain the reservations that appeared in appellants' assignment. As part payment to John F. Camp, a drilling contractor, for drilling the first well, the Company had assigned to the said Camp a twenty-five percent undivided interest in the entire

block, a six percent undivided interest in the entire block, and the entirety of 177.8 acres of the Maurer lease, in respect to which also he had received from the Gulf Production Company an assignment of its reserved interest. From the sale of undivided interests such as were owned by appellants, the Company had received $11,442.00 in cash. It had paid Camp $11,262.64 as part costs of drilling one of the wells. It rented a rig from George Pace and began drilling on the Zimmer lease in August, 1933. It encountered a show of oil, and the Utilities Natural Gas Company, which had advanced $10,000, to which reference is hereinafter made, increased its advance by $2500 and furnished casing to test the well. Between the time of discovery and the making of the test, Camp sold his twenty-eight percent undivided interest in the block to Plummer Oil Corporation for $22,000 cash and an oil payment of $195,580 to be paid out of one-fourth of twenty-eight percent of all oil produced from the block. The second well was abandoned in November, 1933, after it blew out and ruined the hole and the rig. As part of the situation confronting the Corporation in February, 1934, as a result of a settlement made with Pace, Stonleigh Oil and Gas Company was indebted to him in the sum of $21,000, to be paid out of three-eighths of forty-one/forty-eighths of the oil and gas produced from the block. Its entire indebtedness amounted to $27,417.64. This included a salary claim of Reed's and a claim of $4784.56 of Stone's, which included cash advanced and unpaid salary. An attack is made upon the salary item on the ground that it was voted in June, 1933, to operate retroactively.

January, 1934, Stonleigh employed Rupert Cox, a defendant herein, as a broker to sell the block. The contract was extended by various writings to February 17, 1934. According to the testimony of Mr. Cox, he approached seven or eight different prospects and did considerable traveling at his own expense, but was unable to make a sale. After the expiration of the Cox brokerage contract, Stone suggested to Cox that he take the block to prevent the leases from expiring. After some negotiations the assignment of March 8, 1934, was executed by Stone, Reed, Creviston and J. H. Dwire, being all of the stockholders of the Stonleigh Oil and Gas Company, by E. M. Haley, F. H. Sheffield, and by the Company, acting as agent and attorney in fact for other persons whose names were not stated in the body of the instrument, but were stated below. By this instrument eighteen of the twenty-one leases were assigned to Cox. It was recited that the conveyance was intended to include a sixty-seven percent interest in the leases. The consideration was recited to be ten dollars to each of the assignors and an oil payment of $486,280 to be paid the sellers as their interests appeared out of the sixty-seven percent of forty-one/forty-eighths of the oil and gas produced and saved from the property. The oil payment was allocated against the several leases on an acreage basis. Certain leases specifically named were exempt, and the reason given by appellees was that this would enable Cox to secure from Plummer Oil Corporation a transfer of the twenty-eight percent undivided interest which extended over the entire block, and from Camp a transfer and release of the $195,580 oil payment which was to be paid out of one-fourth of twenty-eight percent of all oil produced from the block, and, lastly, to secure the immediate drilling of wells by offering "clear leases" for that purpose. The first $21,000 of the oil payment was to be paid direct to George Pace. The deed was questioned because it did not carry in the body of the instrument the names of those assignees for whom the Stonleigh Company purported to act as attorney in fact. Hence the instrument of April 10, 1934, executed by the Corporation carrying words of conveyance ratifying and confirming the original instrument. A third instrument was executed for the purpose of expressing in dollars and cents the oil payments reserved as against the particular tracts.

The original opinion states briefly the nature of the suit. It relates only to six of the leases, the others having expired before the suit was brought. In addition to pleading in trespass to try title, appellants, as plaintiffs, pleaded in a separate count that the reservation of powers (which will be adverted to later) was void as being repugnant to the grant, a restriction on alienation, as tending to create a perpetuity, as a violation of the Blue Sky Law, Vernon's Ann.Civ.St. art. 579 et seq., and as part of a plan and conspiracy between Gulf and other defendants to defraud plaintiffs and the public; that the transfer was void because executed with-

out a resolution of the Stonleigh Oil and Gas Company board of directors; that there was forgery by substitution of pages; that the corporation made a gift of appellants' interests, there being no consideration; that the instrument created an option; that the corporation had ceased doing business and was insolvent; and that it was secured by the wrongful payment to Stone of $700.

As stated in the original opinion, the pleadings are lengthy and numerous.

■ Appellants urge with great earnestness that the trial Judge was disqualified. The alleged ground of disqualification was that Rupert Cox was associated with a son of the Judge in certain business ventures, in which these properties were not involved, but that an adverse judgment against Cox would result detrimentally to the business ventures in which Cox and a son of the Judge were associated. The Judge's son was not interested in the property in controversy and the verdict would in no wise affect his interests. Our State Constitution (Vernon's Ann.St.Const. art. 5, § 11) specifies the conditions which shall disqualify a judge from sitting. He is forbidden to sit in any case wherein he may be interested, or where either of the parties may be connected with him either by affinity or consanguinity within a degree as prescribed by law, or where he shall have been counsel in the case. Article 15 of the Revised Civil Statutes fixes the third degree as the disqualifying degree of relationship. Our Supreme Court has held that the disqualifications specified in the Constitution are exclusive of all others. Galveston & H. Inv. Co. v. Grymes, 94 Tex. 609, 63 S.W. 860, 64 S.W. 778; Love v. Wilcox, 119 Tex. 256, 28 S.W.2d 515, 70 A.L.R. 1484. The trial Judge was not disqualified, and the assignments based upon that theory are overruled.

We shall now treat of several motions for rehearing filed by litigants whose rights do not depend upon the validity of the contract of March 8, 1934.

■ The first of these is that of La Jita Corporation. The property that appellants seek to recover from La Jita Corporation was no part of the twenty-one leases assigned by Gulf Production Company to William A. Stone. This Corporation does not claim under or by virtue of the transfer and assignment from the Stonleigh Oil and Gas Company to Rupert Cox. From the record it appears that Mrs. Etta Terrell, a widow, granted to J. Nye Ryman the oil rights in 820 acres of land described as being in three tracts. Ryman assigned this lease to the Gulf Production Company; but when the Gulf Production Company assigned twenty-one oil and gas leases to William A. Stone on September 30, 1932, it did not include what was described as the "Second Tract." A portion of the Etta Terrell lease conveyed by that assignment was described as follows: "From Etta Terrell, as Lessor, to J. Nye Ryman, dated August 29, 1928, insofar as it covers and relates to the first and third tracts described therein, said tracts being out of the R. Manchola Grant, said lease being recorded in Vol. 124, page 106, Deed Records, Victoria County, Texas."

The property claimed by La Jita Corporation, and which appellants seek to recover, is a part of what is described as the Second Tract. November 21, 1932, Mrs. Terrell executed a new or top lease to William A. Stone, again describing said 820 acres of land as First Tract, Second Tract and Third Tract. On October 26, 1933, Stone, joined by Stonleigh Oil and Gas Company, assigned to the Gulf Production Company every right created by the renewal or top lease "insofar as same affects and relates to the" Second Tract (describing same). No interest in this top lease was ever assigned by Stone to Stonleigh Oil and Gas Company. It was therefore not included in the assignments to Dr. Norris and other appellants and they never acquired any title therein. The record now discloses that the northwest fifty acres of the northeast 100 acres of the Second Tract were vested in La Jita Corporation; while the southeast 50 acres of the northeast 100 acres of said tract were assigned to and are now vested in Plummer Oil Corporation and the remaining 105 acres of the Second Tract are owned by Gulf Production Company. Since no part of the Second Tract and no interest therein was ever conveyed or assigned to any of appellants, it follows that the trial Court did not err in rendering judgment in favor of said last named defendants as to said portions of said Second Tract.

As respects the interests of Gulf Production Company our attention is called to the fact that while the twenty-one leases were originally owned outright by Gulf Production Company, it now has oil payments on but three. Two of these three are likewise burdened with oil payments in favor of appellants by virtue of the assign-

ment made by Rupert Cox. Appellants do not question Gulf's right to payment on the three leases in question, but in their additional argument filed November 5, 1938, expressly admit that the Gulf is entitled to these payments, and that appellants made no adverse claim with respect thereto. Accordingly the order of reversal should be set aside as to the Gulf Production Company and the judgment should be affirmed insofar as it affects its interests in said three leases and 105 acres of the Second Tract of the Etta Terrell lease, which, as heretofore stated, was never assigned to Stone and was never a part of the Stonleigh block.

■ The claim of the Utilities Natural Gas Company is also different in character from those of other litigants in this case. John F. Camp, a drilling contractor, drilled a well for the Stonleigh Corporation, which well was begun on March 3, 1933, and completed May 19, 1933, and which produced some gas. As part payment for drilling the well Camp, on April 4, 1933, received an assignment of twenty-five percent undivided interest in the lease and also on April 27, 1933, received from Stonleigh Company an assignment of six percent undivided interest. August 14, 1933, Stonleigh Oil and Gas Company, Camp, Frank H. Sheffield and the Stonleigh Company, as attorney in fact, entered into a contract with Utilities Natural Gas Company by which the latter agreed to purchase certain gas to be produced from the Colletto block of leases. The essence of the contract was that the parties named sold to Utilities Natural Gas Company the dry natural gas which might be produced from the leases composing the Colletto block, and the Gas Company agreed to take the gas and paid in advance the sum of $10,000, with the stipulation that said sum should be used in developing and exploring the block for oil and gas. The Gas Company was to pay three cents per thousand cubic feet for gas delivered. All of this took place before the assignment from the Stonleigh Company to Cox, and in view of the powers reserved in the assignments of interests to appellants, there can be no question as to that Company's right to make the assignment to the Gas Company. Therefore, insofar as the judgment of the trial Court affects the rights of the Utilities Natural Gas Company under its contract, it should not be disturbed.

■ We now come to a consideration of the attack made by the original plaintiffs and by their co-plaintiff, Stonleigh Oil and Gas Company, upon the assignment of March 8, 1934, and the other ratifying and supplementary instruments referring to the same. For a full understanding of the issues made upon these questions and which are to be determined now, it is necessary to bear in mind the powers reserved to Stonleigh Oil and Gas Company in its assignments of undivided interests to plaintiffs. Those that are pertinent to the present discussion are as follows:

"1. To sell and dispose of the interest in said oil, gas and mineral leases or any one or more of them, and/or part or parts of such leases and/or undivided interest therein, hereinbefore assigned unto the said Assignee, for such consideration, whether for all cash or all credit, or part cash and part credit, or part cash or credit and part from such proportionate part of the oil produced from said property as Assignor may deem advisable, and for such other consideration and upon such terms and conditions as Assignor may deem advisable; however, Assignor is not authorized, in making any such sale, to create or fix any liability against Assignee except to warrant title to the property right so sold as against Assignee and any person or persons, firms, or corporations claiming by, through or under Assignee, and no further. Assignor is hereby authorized to execute, acknowledge and deliver such written instruments as may be deemed necessary or advisable to carry out the foregoing powers so vested in it.

"2. To sell and dispose of the interest here conveyed unto Assignee and/or that may hereafter accrue to Assignee by reason thereof in the oil, gas and other minerals produced from the tracts of land covered by the leases hereinbefore mentioned, or any one or more of them, or part or parts of such leases, or undivided interest therein, for such consideration as Assignor may deem advisable, whether it be for cash or credit, or part cash and part credit, or such other consideration as Assignor may deem advisable."

A great portion of the briefs and motions of appellants are devoted to a discussion of two propositions advanced by appellants: (1) That the conveyances or assignments of interest by Stonleigh Oil and Gas Company to Cox, exceeded the

reserved powers, and (2) that the fact that the names of plaintiffs were added as grantors or assignors signing by and through the Stonleigh Oil and Gas Company constituted forgery.

· One but needs read the provisions with respect to the powers to be exercised by the Stonleigh Oil and Gas Company, acting with its best judgment, to determine that there is no merit in the first objection to the deed.

■ As to the issue of forgery raised by appellants: The instrument does not purport to be signed in person by the various grantors who are appellants. It is plain from its face that the names were typewritten at the instance of the Company, and the Company purported to act as the agent or attorney in fact for the appellants. The so-called affidavit of forgery of the attorney for appellants is in the following language:

"(a) That the alleged instrument of March 8th, 1934, purporting to be signed by the plaintiffs and purporting to convey the lands in controversy to the defendant Rupert Cox, is as to the plaintiffs a forgery, and they did not sign the same nor authorize the signing of their names thereto. * *

"(c) That the party or parties purporting to sign plaintiffs' names thereto had no authority so to do."

Since the instrument itself did not purport to bear the actual signatures of the plaintiffs, the most that can be said for Mr. Cooke's affidavit is that it is a denial of authority upon the part of plaintiffs to sign for appellants. The clause in the assignment to plaintiffs reading:' "Assignor is hereby authorized to execute, acknowledge and deliver such written instruments as may be deemed necessary or advisable to carry out the foregoing powers so vested in it," is a complete answer to both charges. Within itself it carries the grant of authority to execute the instrument. The instrument itself purports to be executed by Assignees through Assignor. There is, therefore, no merit in these contentions of appellants. Simms v. State, 116 Tex.Cr.R. 97, 32 S.W.2d 852, and cases therein cited.

■ We come now to the affidavit of forgery filed in behalf of Stonleigh Oil and Gas Company. That affidavit was also limited in its scope. It was signed by Fred G. Reed. The entire attack is directed against pages 2, 3 and 4 of the contract of assignment from Stonleigh Oil and Gas Company to Cox, dated March 8, 1934. It does not deny that the purported makers of said contract signed the same. By necessary implication it admits that all parts of said contract except such variations or changes as are alleged to be upon pages 2, 3 and 4 are genuine. It does not state what the variations or changes were or how the proffered contract differed from the contract as Reed claims that it was originally written, unless such contention is contained in the following clause of the affidavit, "there having been no exemptions or exceptions of leases from oil payments in the contract authorized and executed by cross-plaintiff." The affidavit bears internal evidence of its own inaccuracy in respect to this vital matter of exemptions, in that it impliedly admits the correctness of all portions of the contract except pages 2, 3 and 4. The original contract was sent to this Court, and we have it before us. Upon the first page the consideration is stated to be "Four Hundred eighty-six thousand, two hundred and eighty dollars ($486,280.00) to be paid by grantee herein or his assigns to Sellers (as their interests appear) out of one-eighth of sixty-seven percent of forty-one/forty-eighths of the oil and/or gas, if, as and when produced and saved from the hereinafter described properties, (save and except that on and from certain properties described below there shall be no oil payments)." The very last words on the first page are, "Provided, however, that the following leases or parts of leases and lands thereunder are not subject to such oil payment, and in calculating the acreage basis the following tracts of." The sentence is completed on page two. The exempted leases are described in paragraphs I, II, III and IV upon page two of said assignment. The last page of said assignment, which is admittedly genuine, contains a statement of the conditions upon which the conveyance is made and has a vendor's lien clause in the following language: "But it is expressly agreed and stipulated that a vendor's lien is retained (except on land and leases described in I, II, III, IV and V above) to secure the payment of said Four hundred eighty-six thousand two hundred and eighty dollars ($486,280.00) oil and gas payment according to the terms hereof."

This last page is numbered five. It is plain, therefore, from the admittedly genuine portions of the instrument to which the affidavit of forgery is sought to be applied, that the affidavit does not state the facts, and that the witnesses who testified, and upon whose testimony it is sought to raise

a jury issue as to the presence of exemptions, do not state the facts. The admittedly genuine portions of the written instrument are conclusive that the instrument itself in paragraphs I, II, III and IV did contain a list of exempted leases. These witnesses are attempting by parol to vary the terms of a written instrument. However, the question becomes academic in view of certain other proceedings.

▮ We find among the papers sent to us, and which were introduced in evidence, the following:

(1) Written ratification of the assignment of March 8, 1934, signed by Stonleigh Oil and Gas Company by William A. Stone, President, as agent and attorney in fact for the various holders of interests. This instrument, dated and acknowledged April 10, 1934, was attested by Fred G. Reed, Secretary, who likewise made the so-called affidavit of forgery.

(2) An amendment of the assignment of March 8, 1934, bearing the signatures of Stonleigh Oil and Gas Company by William A. Stone, President, attested by its Secretary, Fred G. Reed, and signed individually by William A. Stone, Fred G. Reed, C. G. Creviston, J. H. Dwire, Frank H. Sheffield and E. M. Haley, and signed by the Company as agent and attorney in fact for the various holders of units of interests.

This amendment, which was dated and acknowledged April 11, 1934, provided that instead of allocating the payments to the various leases on an acreage basis, they should be allocated in a fixed sum. An itemization of the allocations is contained in the instrument, and it is upon this allocation that defendants claiming under Cox stand. This instrument was signed by all of the directors and stockholders of the Stonleigh Oil and Gas Company, and concludes that Company and the other makers of the instrument upon the question of the validity of the assignment of March 8, 1934. It was not necessary insofar as the Company was concerned that a formal meeting of the directors should authorize this action, since all of the directors and stockholders joined in the instrument. It was held by our Supreme Court in Aransas Pass Harbor Co. v. Manning, 94 Tex. 558, 63 S.W. 627, that "In the absence of creditors, the consent of directors and stockholders to a conveyance by the president of a corporation of its property was authorized, without any action by the directors as a board." The court recognized that there was a conflict in the decisions of the courts upon the question involved. The various theories are discussed at considerable length and the court answered affirmatively the question, "It not appearing that there were any creditors whose interests could be affected, could the consent of all the directors and all the stockholders to the conveyance give authority to make it, there being no 'corporate action,'—that is to say, no action by the directors as a board?"

At the time the assignment was executed on March 8, 1934, the Company had an equitable interest in twelve and one-half percent of its original interest, the legal title being vested in B. H. Jenkins to secure the payment of a debt. Prior to trial the legal title was reinvested in the Company, and in the pending suit it sought to make this title the basis for relief prayed against defendants. It and J. H. Dwire are concluded by these actions of the stockholders and board of directors, regardless of whether the original resolution authorized the transaction to be so consummated.

▮ In their fifth amended original petition plaintiffs pray for title and possession of their alleged undivided interests in the leases. They also pray for judgment for damages against all defendants, for the removal of clouds cast by the alleged illegal reservations in the conveyances to them and by the conveyance to Cox and in all other conveyances thereunder, and for general and special relief.

We think there is no evidence upon which the court could properly base a judgment granting the relief prayed. The judgment of the Corporation was to be exclusive, and it was liable only in the event of a practice of fraud. Is there any evidence of fraud? Appellants criticize very severely the agreement by Cox to compromise the claim of Stone in the amount of $700, and stigmatize this payment as a bribe. The services of Stone to the Corporation lasted for a number of months after the action of the board of directors in voting a salary. This action of the board indicated its judgment that he should be compensated for his services. He had a claim that at least was debatable as to its merits. It cannot, therefore, be said that there was evidence of bad faith in compromising this claim. There is no evidence that Stonleigh Oil and Gas Company, or any of its stockholders, profited by the assignment to Cox further than that there was a compromise of the claims of those who were insisting upon being paid

salaries. In each case the amount was small. It is fair to suppose that could the properties have been profitably handled the compensation of these persons would have been much larger. There is a total want of evidence of any opportunity to dispose of the properties in such a way as to benefit appellants more than they will be benefited by the contract with Cox. The entire deal with Cox is consistent with an honest desire upon the part of Stone to salvage as much as possible for appellants out of their investments. The whole scheme was highly speculative in the beginning. It is not contended in the pleadings that it was otherwise represented to appellants, or that they made their investments in ignorance of the hazards of the undertaking. There is no evidence that had Stone called upon them they could or would have operated the properties. Nor is there evidence that the various assignees who received exempt leases would have been willing to enter into the plan had they not received these advantages. It appears from the evidence that about two-thirds of the indebtedness of $27,000 had been paid at the time of trial. We cannot say that the unit holders will not receive more than they invested. Nor can we say from the evidence that Stone could have accomplished more than he did for those to whom he owed an obligation, nor that he did not make what appeared to him the best arrangement possible under the circumstances. He could not impose terms upon those from whom he sought aid. He was confronted "by a condition—not a theory." Had the leases expired or had the Gulf Production Company been compelled to take them over to protect them, appellants would have received nothing. Stone was "begging" succor. He could not be a "chooser." There is no evidence that he did not make the best trade possible.

The opinion upon the former motions for rehearing is withdrawn, and the order granting the motions and judgment of reversal and remand are set aside. All motions for rehearing by appellants are overruled. Appellees' motions for rehearing are granted, and the judgment of the District Court is affirmed.

HIGGINS and WALTHALL, Justices.

During the afternoon of June 30, 1939, Honorable Joseph M. NEALON, Chief Justice of the Court of Civil Appeals of the Eighth Supreme Judicial District of Texas, departed this life after a short illness.

The last judicial service performed by the late Chief Justice was to prepare the foregoing opinion. The disposition of the motions for rehearing as indicated therein were concurred in by his associates upon the Bench, and the opinion as prepared was approved by them. Judge NEALON then became ill and never returned to his office. Prior to his death the final draft of the opinion had been typed but, on account of his illness, it was not submitted to him for his signature.

His surviving associates upon the Court, Associate Justices WALTHALL and HIGGINS, now adopt the foregoing opinion prepared by Judge NEALON as the opinion of this Court, order the same filed and direct the entry of the orders indicated therein as the judgment of this Court.

Associate Justices WALTHALL and HIGGINS are conscious of the fact that, in this memorandum, it is inappropriate to eulogize the departed Chief Justice. That will be done by the Bar and its Committees commissioned to appear before the various courts.

The Associate Justices, however, deem it not inappropriate to record here, as they now do, their deep personal grief over the death of the late Chief Justice and their profound consciousness of the great loss which the Bench and Bar, and particularly this Court, has sustained in his death.

Requiescat in pace.